☑ Original ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | Case |
| *or identify the person by name and address)* ) | No.24-802M(NJ) |
| SUBJECT DEVICE 1 is a black Apple iPhone of unknown ) | |
| model in a black case. SUBJECT DEVICE 1 is being held at ) | |
| the FBI's Field Office located at 3600 South Lake Street, St. ) | |
| Francis, Wisconsin 53235. ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

   Please see Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

   Please see Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 3/12/2024_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.     xx☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Honorable Nancy Joseph_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: 2/27/2024 @11:54 a.m._____          *Judge's signature*

City and state:     _____Milwaukee, WI_____          Honorable Nancy Joseph, U.S. Magistrate Judge
                                                                    *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to be Searched

I seek this search warrant to search the cellular telephone, described as a black Apple iPhone of unknown model in a black case as pictured below (**SUBJECT DEVICE 1**), which has been maintained in a manner so that the contents are, to the extent material to this investigation, in substantially the same state as they were when the **SUBJECT DEVICE 1** first came into the possession of law enforcement. **SUBJECT DEVICE 1** is being held at the FBI's Field Office located at 3600 South Lake Street, St. Francis, Wisconsin 53235.

This warrant authorizes the forensic examination of **SUBJECT DEVICE 1** for the purpose of identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

### Particular Things to be Seized

1.     All records on **SUBJECT DEVICE 1** described in Attachment A that relate to violations of 18 U.S.C. §§ 1111, 1151, 1153, 18 U.S.C. §§ 1112, 1151, 1153, 18 U.S.C. §§ 113(a)(6), 1151, 1153, Mich. Comp. Law § 750.136b(3), 18 U.S.C. §§ 1151, 1153 and involve Eugene Rantanen, including:

    a.  All forms of communication regarding violent acts and contacts with Victim and Witness;

    b.  mobile applications, including but not limited to Facebook, that may be used to communicate with witnesses;

    c.  location information; and

    d.  call detail records including but not limited to records showing when and what numbers the phone called, sent messages to, received calls from, and/or received messages from.

2.     Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>SUBJECT DEVICE 1 is a black Apple iPhone of unknown model in a<br>black case. SUBJECT DEVICE 1 is being held at the FBI's Field Office<br>located at 3600 South Lake Street, St. Francis, Wisconsin 53235. | )<br>)<br>)<br>)<br>)<br>)    Case No. 24-802M(NJ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Please see Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____, there is now concealed *(identify the person or describe the property to be seized)*:

Please see Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1111,1151, 1153 | Murder |
| 18 U.S.C. §§ 1112, 1151, 1153 | Manslaughter |
| 18 U.S.C. §§ 113(a)(6), 1151, 1153 | Assault resulting in serious bodily injury |
| 18 U.S.C. §§ 1151, 1153, Mich. Comp. Law §750.136b(3)(b). | Child Abuse, second degree |

The application is based on these facts:

Please see Affidavit.

☑ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Alex Travers, Special Agent, FBI
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means).*

Date: 2/27/2024
_____
*Judge's signature*

City and state: Milwaukee, WI      Honorable Nancy Joseph, U.S. Magistrate Judge
_____
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>

**AN APPLICATION FOR A SEACH WARRANT**

I, Alex Travers, being duly sworn, do hereby state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this continuation in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, one (1) cell phone **(SUBJECT DEVICE 1)** which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.  The **SUBJECT DEVICE** is currently held at the FBI's field office located at 3600 South Lake Street, St. Francis, Wisconsin 53235.

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed since 2022. I am currently assigned to the Detroit Division, Marquette Resident Agency (Michigan). Prior to my employment with the FBI, I was a police officer for over eight (8) years in Cranston, Rhode Island where I served as a patrol officer, in temporary assignments with the department's Special Investigations Unit, and as a patrol sergeant.

3.      My duties include the investigations of various violations of federal criminal law, including matters involving violations of:

   a.   18 U.S.C. §§ 1111,1151, 1153—murder;

   b.   18 U.S.C. §§ 1112, 1151, 1153—manslaughter;

   c.   18 U.S.C. §§ 113(a)(6), 1151, 1153—assault resulting in serious bodily injury; and

   d.   18 U.S.C. §§ 1151, 1153, Mich. Comp. Law § 750.136b(3)(b), child abuse – second degree.

4.      The facts in this continuation come from my personal observations, my training and

1

experience, and information obtained from other agents, other law enforcement officers, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.    I submit that this continuation shows there is probable cause to believe that Eugene Walter-George Rantanen (hereafter "Rantanen") committed the crimes of:

    a.    18 U.S.C. §§ 1111,1151, 1153—murder;

    b.    18 U.S.C. §§ 1112, 1151, 1153—manslaughter;

    c.    18 U.S.C. §§ 113(a)(6), 1151, 1153—assault resulting in serious bodily injury; and

    d.    18 U.S.C. §§ 1151, 1153, Mich. Comp. Law § 750.136b(3)(b), child abuse – second degree.

6.    Further, I submit that there is probable cause to believe that evidence, as defined in Attachment B be found on **SUBJECT DEVICE 1** and further described below and in Attachment A.

**IDENTIFICATION OF THE ITEMS TO BE EXAMINED**

7.    I seek this search warrant to search the cell phone (**SUBJECT DEVICE 1**) that was in the possession of Eugene Rantanen (hereafter "Rantanen") on February 22, 2024. **SUBJECT DEVICE 1** is a black Apple iPhone of unknown model in a black case. **SUBJECT DEVICE 1** was seized on February 22, 2024 by the FBI at Milwaukee Campus – Children's Wisconsin Hospital. The FBI secured and maintained **SUBJECT DEVICE 1** in a manner such that the phone's contents are the same as when it was seized. Based on the information outlined below, there is probable cause to believe that evidence of the crimes under investigation will be found on the **SUBJECT DEVICE 1**.

8.    The applied-for warrant would authorize the forensic examination of the

**SUBJECT DEVICE 1** for the purpose of identifying electronically stored data particularly described in Attachment B.

## <u>PROBABLE CAUSE</u>

9.      I am informed by the Unites States Attorney's Office that murder under 18 U.S.C. § 1111 includes felony murder, which requires the following elements:

   a.   The suspect caused the death of the victim;

   b.   The death resulted from the knowing or intentional perpetration of child abuse; and

   c.   The suspect is an Indian; and

   d.   The offense occurred in Indian Country.

10.     I am informed by the Unites States Attorney's Office that murder under 18 U.S.C. § 1111 also includes second-degree murder, which requires the following elements:

   a.   The suspect caused the death of the victim;

   b.   The defendant acted with malice aforethought[1]; and

   c.   The suspect is an Indian; and

   d.   The offense occurred in Indian Country.

11.     I am informed that to establish the offense of manslaughter, the following elements are required:

   a.   The suspect caused the death of the victim;

   b.   The killing was without malice;

---

[1] The government can prove malice aforethought several ways including by showing that defendant acted with recklessness that "demonstrated an *extreme* disregard for human life." *United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir. 1995); *United States v. Hillsberg*, 812 F.2d 328, 334 (7th Cir. 1987) (explaining malice aforethought can be met by showing "wanton disregard of the consequences to human life").

3

c.   The suspect is an Indian; and

d.   The offense occurred in Indian Country.

12.      I am informed by the United States Attorney's Office that to establish the charge of assault resulting in serious bodily injury for a crime committed by an Indian within Indian Country, the following elements must be met:

a.   The suspect assaulted the victim;

b.   The assault resulted in serious bodily injury;

c.   The suspect is an Indian; and

d.   The offense occurred in Indian Country.

13.      I am informed by the United States Attorney's Office that to establish the charge of child abuse – second degree by an Indian within Indian Country, the following elements must be met:

a.   First, that suspect is the parent or guardian of the child.

b.   Second, that suspect had care or custody of or authority over the when the abuse allegedly happened, regardless of the length of time the child was cared for by, in the custody of, or subject to the authority of that person.

c.   Third, that the suspect's reckless act caused serious physical harm or serious mental harm to a child.

i.   "Serious physical harm" means any physical injury to a child that seriously impairs the child's health or physical well-being, including, but not limited to, brain damage, a skull or bone fracture, subdural hemorrhage or hematoma, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut.

4

ii.  "Serious mental harm" means an injury to a child's mental condition that results in visible signs of an impairment in the child's judgment, behavior, ability to recognize reality, or ability to cope with the ordinary demands of life.

d.  The child was at the time under the age of 18.

e.  The suspect is an Indian.

f.  The offense occurred in Indian Country.

14.    The residence, 16385 Skanee Road, L'Anse, Michigan 49946, where the incident occurred, is located within the exterior boundaries of the L'Anse Reservation of the Keweenaw Bay Indian Community, a federally recognized tribe, which the United States Attorney's Office informs me makes it Indian Country as defined by federal law. The residence is located within the Northern Division of the Western District of Michigan. Rantanen is an enrolled member of the Keweenaw Bay Indian Community and is an Indian for purposes of federal law.

15.    On February 19, 2024 at approximately 7:01 p.m., police responded to a 9-1-1 call at 16385 Skanee Road, L'Anse, Michigan 49946. The caller, Rantanen, reported that Victim, who is approximately a year and a half old, was not responsive. Police and emergency medical services responded to the residence. Rantanen and Victim were the only occupants of the residence when first responders arrived.

16.    In the 9-1-1 call made by Rantanen, he reported he found Victim not breathing. Rantanen told the dispatcher that Victim was slumped over the bed and not breathing. Rantanen left Victim on the bed for a nap. Rantanen told the dispatcher that he observed cuts on Victim's tongue. Rantanen updated the dispatcher that Victim started breathing, but Victim's breathing was irregular.

5

17.     In the 9-1-1 call, Rantanen identified the phone number that he was calling from as a number ending -2328. Additionally, first responders can be heard in the background of the 9-1-1 call rendering aid to Victim including instructions from an automated external defibrillator. I reviewed police body camera footage. In the footage, I observed a cell phone on a highchair in the living room where responders were rendering aid to Victim. The cell phone appeared to be on speaker and on the line with 9-1-1.



*Figure 1*

18.     In the body camera footage, Rantanen gestured towards this cell phone and asked a police officer to hand Rantanen his cell phone. The police officer retrieved the phone and handed it to Rantanen.

19.     It appeared that Rantanen then made a phone call to someone who I believe to be his wife, Alicia. Rantanen referred to the person as "babe" and instructed the person to come home. A police officer instructed Rantanen to have her meet him at the hospital.

20.     Medical services transported Victim to Baraga County Memorial Hospital, then to Hospital Sisters Health System St. Vincent Hospital in Green Bay, Wisconsin. Once at St. Vincent, medical staff observed bruising to Victim's head, torso, and other regions. Medical staff reported a Computed Tomography (CT) scan of Victim's head revealed internal bleeding. The bruising on

6

Victim's torso appeared consistent with marks from fingertips. Rantanen told first responders that he left Victim alone in a room, and when Rantanen returned, Victim was unresponsive.

21.     Victim was transported to Milwaukee Campus – Children's Wisconsin, in Milwaukee, Wisconsin. Medical staff observed bruising to Victim's head, torso, scrotum, and buttocks. Medical staff reported that Victim's injuries were consistent with trauma, Victim was showing little signs of life, and signs of Abusive Head Trauma (AHT). Based on a meeting between with medical staff at Children's Wisconsin, the child was not likely to recover, and was likely to die unless kept on life support.  I spoke with a doctor providing care to Victim, who said that the observed injuries were consistent with those they would expect to see when a child without proper safety restraints is in a car accident.

22.     Based on my training and experience and conversations with investigators and medical professionals, the injuries and marks observed on Victim are consistent with non-accidental trauma caused by someone other than the Victim.

23.     I was informed by personnel at the Michigan Department of Health and Human Services that Rantanen is Victim's parent.

24.     The FBI obtained medical records for Victim from Baraga County Memorial Hospital (BCMH). Those records indicate that Victim had multiple subdural hematomas.

25.     FBI SA Richard Grout interviewed a doctor who spoke to Rantanen and Rantanen's wife, Alicia Rantanen (hereafter "Alicia"), at BCMH.  Rantanen told the doctor that Victim was fine when Victim was put down for a nap. Rantanen came back five minutes later and observed Victim sitting up, slumped over, and limp. Rantanen picked up Victim, noticed Victim was not breathing at all, and called 9-1-1. Victim started breathing during the 9-1-1 call. Prior to Rantanen finding Victim like this, Victim was acting and eating normally and otherwise doing well.

7

According to Rantanen, Victim was sick with a respiratory illness and was scheduled for follow-up in the near future. Rantanen did not mention anyone else being present with him and Victim during the incident. Alicia told the doctor that she last saw Victim around 4:00 p.m. that day when she came home between work shifts. She said "hi" to Rantanen and Victim, then went to work. At the time, Victim was eating and doing well. Alicia did not mention anyone else being in the home. The doctor stated that Rantanen and Alicia were together when they spoke to the doctor.

26.     On February 20, 2024, the FBI, Keweenaw Bay Tribal Police, and Michigan State Police Crime Scene Response Team executed a federal search warrant at 16385 Skanee Road. Investigators seized wipes with suspected blood from the area of the bathroom and hallway:



*Figure 2*

27.     Additionally, investigators seized the mattress of a pack and play as it contained suspected blood:



*Figure 3*

28.    The FBI interviewed a witness (hereafter "Witness") who was in communication

with Rantanen through text message regarding Victim's medical care:



*Figure 4*

10



*Figure 5*



*Figure 6*

29.    Witness reported that she communicated with Alicia through Facebook Messenger. On several occasions, Witness observed bruises to Victim's forehead and cheeks when Victim came into Witness' custody for the weekend.  Witness specifically recalled seeing bruising on Victim around February 2024.  Witness was aware that Victim slept in a pack and play at Rantanen and Alicia's home. Witness was informed that Victim fell when climbing out of his pack and play. Witness asked if Victim could sleep in a toddler bed at Rantanen and Alicia's home. Alicia responded to the question by stating, "(Witness) didn't seem concerned when we had to pull him from adoption." Alicia blocked Witness on Facebook until after Victim went to the hospital on February 19, 2024.

30.    Witness provided the FBI with images of Victim's prior bruising from around February 2024.[2]  Figure 7 is an image provided of Victim that Witness said they took on February 9 showing significant bruising on the forehead.  Figure 8 is an image provided of Victim that Witness said they took on February 10 showing the bruising had partially healed.

---

[2] I redacted these images to protect Victim's identity.



*Figure 7*



*Figure 8*

31.     Based on my knowledge, training, and experience, I know that Facebook has a

mobile application in which users can access Facebook from their cell phones. Additionally, I know that accessing Facebook through the mobile application is a popular way that users utilize the platform.

32.    On February 22, 2024, investigators had another meeting with medical staff at Children's Wisconsin and learned for medical staff, the current findings represent the highest-level concern for non-accidental trauma.

33.    On February 22, 2024, the FBI arrested Rantanen at Children's Wisconsin pursuant to an arrest warrant for violations of 18 U.S.C. §§ 113(a)(6), 1151, 1153, assault resulting in serious bodily injury, and 18 U.S.C. §§ 1151, 1153, Mich. Comp. Law § 750.136b(3)(b), child abuse – second degree. (See *United States v. Eugene Walter-George Rantanen*, 2:24-mj-00010-MV, filed in the Northern Division of the Western District of Michigan; a copy can be provided to this Court upon request.) The FBI seized Rantanen's cell phone **(SUBJECT DEVICE 1)** incident to arrest.  Additionally, the FBI met with Alicia on February 22, 2024 and seized her cell phone after an FBI Special Agent mistakenly told Alicia that there was a search warrant for her phone. **SUBJECT DEVICE 1** were subsequently secured at the FBI Milwaukee Field Office.

34.    On February 24, 2024, I was informed that Victim was pronounced deceased.

35.    I submit there is probable cause to believe the crimes under investigation were committed.  Regarding all of these crimes, Rantanen is an Indian and the residence where this occurred is in Indian Country. Based on the medical evidence that this was non-accidental trauma consistent with battery, that Rantanen was alone with the minor, and that the Victim died as a result, there is probable cause to believe Rantanen is guilty of felony murder (murder during the perpetration of child abuse) or voluntary manslaughter (murder without malice) as well as assault resulting in serious bodily injury. Regarding child abuse second degree, Rantanen is Victim's

15

father and had custody of Victim; based on the nature of the wounds, I submit there is probable cause to believe that Rantanen recklessly, knowingly or intentionally[3] committed an act that caused serious physical and mental harm to Victim; and Victim was under 18.

36. Based on my knowledge, training, and experience, I submit that there is probable cause to believe that a search of **SUBJECT DEVICE 1** will provide investigators with additional information including, but not limited to location information and evidence of the Victim's condition leading up to the 9-1-1 call and throughout Victim's medical care up to the moment the phones were seized.

## TECHNICAL TERMS

37. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and

---

[3] I am informed by the U.S. Attorney's Office that if Rantanen committed the act intentionally or knowingly, he would satisfy the recklessness state of mind.

16

moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some

17

GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

18

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

38.  Based on my training, experience, and research, I know that the **SUBJECT DEVICE** have capabilities that allow them to serve as wireless telephone and portable media player. Further based on my training and experience, most smartphones have the capability to operate as a GPS navigation device and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

39.  Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

40.  *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

19

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

41. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

42.    *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## AUTHORITY TO OBTAIN BIOMETRIC CHARACTERISTICS

43.    The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the

21

bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, **SUBJECT DEVICES** were seized. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

22

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the Subject Premises

23

and reasonably believed by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

44.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

## **CONCLUSION**

45.     I submit that this continuation supports probable cause for a search warrant authorizing the examination of **SUBJECT DEVICE 1** described in Attachment A to seek the items described in Attachment B.

24

## ATTACHMENT A

### Property to be Searched

I seek this search warrant to search the cellular telephone, described as a black Apple iPhone of unknown model in a black case as pictured below (**SUBJECT DEVICE 1**), which has been maintained in a manner so that the contents are, to the extent material to this investigation, in substantially the same state as they were when the **SUBJECT DEVICE 1** first came into the possession of law enforcement. **SUBJECT DEVICE 1** is being held at the FBI's Field Office located at 3600 South Lake Street, St. Francis, Wisconsin 53235.

This warrant authorizes the forensic examination of **SUBJECT DEVICE 1** for the purpose of identifying the electronically stored information described in Attachment B.



## ATTACHMENT B

### Particular Things to be Seized

1.      All records on **SUBJECT DEVICE 1** described in Attachment A that relate to violations of 18 U.S.C. §§ 1111, 1151, 1153, 18 U.S.C. §§ 1112, 1151, 1153, 18 U.S.C. §§ 113(a)(6), 1151, 1153, Mich. Comp. Law § 750.136b(3), 18 U.S.C. §§ 1151, 1153 and involve Eugene Rantanen, including:

       a.  All forms of communication regarding violent acts and contacts with Victim and Witness;

       b.  mobile applications, including but not limited to Facebook, that may be used to communicate with witnesses;

       c.  location information; and

       d.  call detail records including but not limited to records showing when and what numbers the phone called, sent messages to, received calls from, and/or received messages from.

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the subject premises and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

26

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

27